STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FEDERAL INSURANCE COMPANY | : | |
| OF NEW JERSEY, AS SUBROGEE | : | |
| OF CHARLES RIVER LABS/SPAFAS | : | NO.: 3:02CV306 (GLG) |
| | : | |
| v. | : | |
| | : | |
| ASSOCIATED SECURITY | : | |
| CORPORATION, AND MCQUAY | : | |
| INTERNATIONAL D/B/A MCQUAY | : | |
| SERVICE AIR CONDITIONING | : | DECEMBER 1, 2003 |

<u>**MEMORANDUM OF LAW IN SUPPORT OF MCQUAY'S**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

**I.    <u>FACTUAL BACKGROUND</u>**

This is a subrogation action brought by Federal Insurance Company, a

subrogee of Charles River Labs/SPAFAS (hereinafter "SPAFAS"). The subrogation

claim stems from the death of 2,965 chickens and resulting loss of egg production on

or about February 22, 2001. <u>See</u> Plaintiff's Complaint ¶¶ 16-18. The chickens were

housed in "J-house," a poultry house operated by SPAFAS and located on Miller Road

in Preston, Connecticut. <u>See</u> Plaintiff's Complaint ¶ 6. The chickens died as a result

of a lack of oxygen. <u>See</u> deposition transcript of John Sabrowski, pp. 98-99, attached

as **Exhibit A**. For purposes of this motion, the defendant concedes that the primary

HVAC unit at J-house had stopped working properly, resulting in a lack of oxygen.

The plaintiff initiated this action by way of a four-count complaint filed with the court on February 19, 2002.  The plaintiff alleges negligence and breach of contract against both defendants, Associated Security Corporation and McQuay International d/b/a McQuay Service Air Conditioning (hereinafter "McQuay").  Specifically, the plaintiff alleges that McQuay was negligent and breached its contractual obligations in the following ways:

(a)    failing to properly inspect, task, service and maintain the HVAC units;

(b)    failing to properly hire employees who are properly trained to inspect the HVAC units;

(c)    failing to perform its contractual obligations in a non-negligent manner; otherwise, acting negligently as will be disclosed during the discovery process.

See Plaintiff's Complaint, ¶20.  The defendant McQuay moves for summary judgment as to both counts directed against it.

As of February 2001, Miller Road consisted of five (5) poultry houses, two of which contained HVAC units manufactured by McQuay.  See **Exhibit A**, pp. 12, 13. The two buildings that contained McQuay units were built in 1995 or 1996 and are referred to as I-house and J-house.  See **Exhibit A**, p. 13.  Two HVAC units, each consisting of a furnace and an air handler, were installed in each of these houses. See **Exhibit A**, pp. 16-17, 56.  Swan Associates, who is not a party to this lawsuit, installed the units and performed the maintenance on the units for the first four years. See **Exhibit A**, pp. 17, 22-23.  SPAFAS experienced problems with the HVAC units

2

during Swan's involvement, and thus SPAFAS turned to McQuay in 2000.  <u>See</u>

**Exhibit A**, p. 34.

John Sabrowski is the individual who was involved in the operation,

maintenance and/or service of the HVAC units on behalf of SPAFAS.  <u>See</u> Plaintiff's

Interrogatory Responses, No. 4, attached as **Exhibit B**.  Mr. Sabrowski testified that

the two HVAC units at J-house allowed for a backup system.  <u>See</u> **Exhibit A**, p. 56.

The backup unit could only be activated manually.  <u>See</u> **Exhibit A**, pp. 33, 56-57, 91-

93.  The system was designed in such a fashion by Dave Hansel, a former Charles

River Labs' employee.  <u>See</u> **Exhibit A**, pp. 14-16, 92-94.  The problem on February

22, 2001 occurred only with the primary unit, as it was the only unit in operation at the

time.  <u>See</u> **Exhibit A**, pp. 56-57, 74.  Neither the furnace nor the air handler (blower)

on the primary unit was working.  <u>See</u> **Exhibit A**, p. 97.  Mr. Sabrowski started up the

air handler by simply resetting the furnace.  <u>See</u> **Exhibit A**, pp. 55-57, 97-99.

Prior to February 22, 2001, SPAFAS had hired McQuay to inspect, service and

repair the HVAC systems located at I-house and J-house.  <u>See</u> Plaintiff's Complaint

¶ 8.  The parties entered into the only contractual agreement between them on or

about November 6, 2000.  <u>See</u> Assured Maintenance Agreement, attached as **Exhibit

C**; and deposition transcript of Robert Sirpenski, pp. 48-50, attached as **Exhibit D**.

APAFAS agreed to pay McQuay $4,133.00 for its services under the Agreement.  <u>See</u>

**Exhibit C**, p. 4. Pursuant to said Agreement, McQuay was required to provide four (4)

inspections of the heating and air conditioning units per year, beginning November 1, 2000.  See **Exhibit C**; and **Exhibit D**, pp. 48-50.  In consideration for said services, SPAFAS agreed to the following:

16.     MCQUAYSERVICE SHALL NOT IN ANY EVENT BE LIABLE TO THE CUSTOMER OR TO THIRD PARTIES FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT OR SPECIAL DAMAGES, INCLUDING BUT NOT LIMITED TO, LOSS OF PRODUCTION, LOSS OF USE OR LOSS OF PROFITS OR REVENUE ARISING FROM ANY CAUSE WHATSOEVER INCLUDING, BUT NOT LIMITED TO ANY DELAY, ACT, ERROR OR OMISSION OF MCQUAYSERVICE.  IN NO EVENT WILL MCQUAYSERVICE'S LIABIILITY FOR DIRECT OR COMPENSATORY DAMAGES EXCEED THE PAYMENT RECEIVED BY MCQUAYSERVICE FROM CUSTOMER UNDER THE INSTANT AGREEMENT.

See **Exhibit C**, ¶¶16, 18.  Robert Sirpenski read and signed the Agreement on behalf of SPAFAS.  See **Exhibit C**, p.5; and **Exhibit D**, pp. 48-49.

McQuay's obligations with respect to inspections were contained entirely within this Agreement.  See **Exhibit D**, p.51.  Pursuant to said Agreement, McQuay had performed one inspection prior to the February 22, 2001 incident.  The inspection was conducted on November 29, 2000.  See McQuay service record dated 11/29/00, attached as **Exhibit E**.

Aside from the inspections contracted for under the Agreement, McQuay also performed routine service work and emergency service work for SPAFAS as needed.  See **Exhibit D**, p. 52.  There was no separate contractual agreement to

provide servicing or repairs.  <u>See</u> **Exhibit D**, p. 56.  Every service order did,

however, contain the following language:

> **LIMITATION OF LIABILITY:**
> McQuay, its contractors and suppliers of any tier shall not be liable in contract, in tort (including negligence) or otherwise for damage or loss of property or equipment, loss of profits or revenue, loss of use of equipment or power system, cost of capital, cost of purchased ore replacement power or temporary equipment (including additional expense incurred in using existing facilities), claims of customers of the purchaser, or for any special, indirect, incidental or consequential damages, whatsoever.
>
> The remedies of the purchaser set forth herein are exclusive and the liability of McQuay with respect to any contract, or anything done in connection herewith such as the performance or breach thereof, of from the manufacture, sale, delivery, resale, installation or technical direction of installation, maintenance or technical direction of maintenance, repair or use of any equipment covered by or furnished under the contract, whether in contract, tort (including negligence) or otherwise, shall not exceed the price set forth herein for the work.

<u>See</u> **Exhibit E**, Terms and Conditions.

Any service work by McQuay would occur only after receipt of a call from

SPAFAS.  <u>See</u> **Exhibit D**, p. 52.

Charles River Labs, a biotech company that is traded on the New York

Stock Exchange.  <u>See</u> **Exhibit D**, pp. 5,7.  SPAFAS is an operating division of

Charles River Labs.  <u>See</u> **Exhibit D**, p. 4.  SPAFAS produces pathogen free

eggs for vaccines and research purposes.  <u>See</u> **Exhibit D**, pp.5-6, 37.

## II.    <u>DISCOVERY</u>

McQuay served the plaintiff interrogatories and requests for production on

November 1, 2002.  McQuay asked, in pertinent part, the following:

14.    With respect to paragraph 20 of the complaint, please state in detail the basis for the plaintiff's contention that McQuay International failed to properly inspect, test, service and maintain the HVAC units.

15.    With respect to paragraph 20 of the complaint, please explain in detail the basis for the plaintiff's contention that McQuay International failed to properly hire employees who were properly trained to inspect and service the HVAC units.

16.    With respect to paragraph 20 of the complaint, please explain in detail the basis for the plaintiff's contention that McQuay International failed to perform its contractual obligations in a non-negligent manner.

17.    Identify each and every contractual obligation that McQuay International allegedly failed to perform, and state where the contractual obligation is set forth in writing.

18.    State any other basis for the plaintiff's contention that McQuay International's negligence caused the death of 2965 chickens and resulting damages.

19.    With respect to plaintiff's contention that McQuay International was negligent, please state:
    (a)    a description of each alleged negligent act;
    (b)    the date of each alleged negligent act;
    (c)    the name of the individual who performed each negligent act;
    (d)    the name, address and telephone number of all witnesses to each alleged negligent act;
    (e)    whether Federal Insurance has in its possession any documents that relate to or substantiate each alleged negligent act.

20.    With respect to the plaintiff's contention that McQuay International breached its contractual obligations to properly maintain and service HVAC systems, please state

(a)    a description of each alleged breach;

(b)    the date of each alleged breach;

(c)    the name of each individual who allegedly breached McQuay International's contractual obligation;

(d)    the name, address and telephone number of all witnesses to each alleged breach;

(e)    whether Federal Insurance has in its possession any documents that relate to or substantiate each alleged breach.

The plaintiff's responses to each of these interrogatories was as follows:

Plaintiff contends that McQuay failed to properly inspect, test, service and maintain the HVAC units because the primary furnace unit and the secondary furnace unit failed to ignite on February 22, 2002. If the unit had been properly maintained, the unit should have provided heat to the J-House Poultry House.

See **Exhibit B**, ¶¶ 14-20.

Despite McQuay's attempts to seek clarification regarding the plaintiff's claim for liability against it, including filing a motion to compel, the plaintiff has failed to provide any further description as to the basis for its claims against McQuay.

The plaintiff identified four fact witnesses as having pertinent information to the plaintiff's claims. Those individuals are John Sabrowski (maintenance manager), Chester Izbicki, Russel Larson (production manager) and Robert Sirpenski (controller). The defendants have deposed all four individuals. Each testified that he has no knowledge of any breach of a contractual obligation by McQuay. See

**Exhibit A**, pp. 67-70; **Exhibit D**, pp. 59-60; and deposition transcript of Russel Larson, pp. 48, 53, attached as **Exhibit F**.  Each testified that he is not aware of the cause of the problem with the HVAC unit on the date in question.  <u>See</u> **Exhibit A**, pp. 66-67; **Exhibit D**, p. 68; and **Exhibit F**, pp. 26, 53-54.  And each testified that he is not aware of any work that McQuay performed improperly and/or negligently.  <u>See</u> **Exhibit A**, pp. 68-70; **Exhibit D**, pp. 60-61; and **Exhibit F**, p. 53.

Mr. Sabrowski, maintenance manager, testified, in pertinent part, that: (i) he is not qualified to determine the cause of the problem with the J-house HVAC unit; (ii) SPAFAS did not attempt to investigate the cause of the problem; and (iii) parts of the HVAC unit (including the variable speed drives "VSDs" and the electrical thermostats) were subsequently replaced and discarded.  <u>See</u> **Exhibit A**, pp. 40-43; 66-67, 76-77.  Mr. Sabrowski explained that the units have operated properly since the VSDs were replaced.  <u>See</u> **Exhibit A**, pp. 35-36.

The plaintiff has not disclosed any expert witnesses regarding liability.  <u>See</u> **Exhibit B**, ¶¶ 22-24.  The deadline for the plaintiff's disclosure of expert witnesses passed on January 30, 2003.  SPAFAS did not conduct or cause to be conducted an investigation into the cause of the problem with the HVAC unit.  <u>See</u> **Exhibit A**, pp. 66-67; and **Exhibit B**, ¶¶ 10, 11.  Similarly, aside from plaintiff's counsel, no one has conducted an investigation into the cause of the problem on behalf of the plaintiff.

<u>See</u> **Exhibit B**, ¶¶ 12, 13.  The plaintiff has failed to produce a report pertaining to any investigation into the cause of the problem.

### III.    <u>LEGAL STANDARD</u>

The court shall render summary judgment when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment in the manner of law."   Fed. R. Civ. P. 56c; <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 250 (1986).  A factual dispute is "genuine" when the evidence is such that a reasonable jury can return a verdict for the non-moving party.  <u>See Anderson</u>, 477 U.S. at 247-48.  A "material fact" is one whose resolution will effect the ultimate determination of a case.  <u>See id</u>.

In determining whether a material issue of fact exists, the court must resolve all ambiguities and draw all inferences against the moving party.  <u>See Anderson</u>, 477 U.S. at 255; <u>J. F. Feeser, Inc. v. Servi-a-Portion, Inc.</u>, 909 F.2d 1524, 1531 (3rd Cir. 1990), <u>cert. denied</u>, 499 U.S. 921 (1991).  However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  <u>Samuels v. Smith</u>, 839 F.Supp. 959, 962 (D.Conn. 1993).  A non-moving party may not rely on mere allegations, legal conclusions, unsupported statements, or a denial of the pleadings.  <u>See Celetex Corp. v. Catrett</u>, 477 U.S. 317,

327 (1986).  In order to defeat a motion for summary judgment, the non-moving party

must present contradictory *evidence* "such that a reasonable jury could return a verdict

for the non-moving party."  Anderson, 477 U.S. at 248.

## IV.    LAW AND ARGUMENT

### A.    The Plaintiff's Claims Must Fail As There Is No Evidence To Establish A Breach Of Duty By McQuay

#### 1.    Negligence Cannot Be Established Absent Expert Testimony.

"A breach of duty by the defendant and a causal connection between the

defendant's breach of duty and the resulting harm to the plaintiff are essential

elements of a cause of action in negligence."  Santopietro v.City of New Haven, 239

Conn. 207, 225 (1996), quoting, Catz v. Rubenstein, 201 Conn. 239, 44, 513 A.2d 98

(1986).  In a negligence case where the defendant is alleged to have particular skill

and expertise that is beyond the knowledge of an ordinary trier of facts, expert

testimony is required.  See Santopietro, 239 Conn. 226; Monterose v. Cross 60 Conn.

at 655, 658, 760 A.2d 1013 (2000).

In Santopietro, the plaintiff sought to recover damages for personal injuries

sustained when he was struck by a baseball bat during an umpired softball game.  The

plaintiff sued the individual who threw the bat as well as the two umpires.  As to the

negligence claim against the umpires, the trial court set aside the jury verdict in favor

of the plaintiff.   See id, at 210.  On appeal, the Supreme Court analyzed the plaintiff's

claim in terms of *professional negligence* or malpractice.  See Id, at 226.[1]  The Court

concluded that an umpire possesses knowledge that is beyond the experience and

understanding of the ordinary fact finder, and that expert testimony was required to

establish whether the defendant umpires breached the standard of care.  Id. at 227,

229.  Finding that the plaintiffs failed to prove by expert testimony that the umpires

breached the applicable standard, the Court affirmed the directed verdict.  Id. at 232.

     In Matyas v. Mink, 37 Conn. App. 321 (1995), the plaintiff filed suit against the

engineer who designed his septic system.  The complaint alleged that the defendant

engineer was negligent in designing the system.  The jury returned a verdict in favor of

the plaintiff, but the trial court set aside the verdict.  On appeal, the Appellate Court

affirmed the trial court's decision to set aside the verdict on the ground that the plaintiff

failed to establish a breach of the standard of care through expert testimony.  Id. at

329.  The Court noted that the issues in the case were technical and required training

and technical expertise.  See id, at 327.  The Court specifically rejected the plaintiff's

argument that the evidence presented was so obvious as to be clear to a layperson

without expert assistance.  See id, at 329.  See also, Blumenkopf v. East, 2002 Ct.

Sup. 8203-cv (June 28, 2002) (Purtill, J.) (expert testimony necessary against both

---

[1] The Court had previously defined professional negligence as "the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or

building contractor and engineer) (attached as **Exhibit G**); Garguillo Constr. v.

Consulting Eng., 2002 Ct. Sup. 13583 (Oct. 25, 2002) (Zoarski, J.) (expert testimony

required to prove negligence against engineer) (attached as **Exhibit H**).

In claims for negligent repair, expert testimony is almost always required…."

Rauscher v. General Motors Corp. 905 S.W.2d 158, 162 (Mo. App. E.D. 1995),

attached is **Exhibit I**. In Rauscher, the plaintiff alleged that the defendant was

negligent in its failure to discover and correct the defect that later caused her vehicle to

stall and die. The plaintiff, however, failed to present any evidence of the prevailing

standards in automobile repair. As such, the trial court entered a directed verdict

against the plaintiff on her claim of negligent repair. The Missouri Court of Appeals

affirmed.

Expert testimony is required "when the question involved goes beyond the field

of the ordinary knowledge and experience of judges or jurors." Bader v. Methodist

Orthodox Synagogue, 148 Conn. 449, 454, 172 A.2d 192 (1961). In the instant case,

the issues involved are beyond the ordinary knowledge and experience of jurors. The

plaintiff has essentially alleged a cause of action for negligent inspection and/or repair

of an HVAC system, claims that require expert testimony. See Rauscher, supra. The

plaintiff's own witnesses have testified that they do not have the requisite knowledge to

---

damage to the recipient of those services." Id, at 226, quoting, Davis v. Margolis, 215 Conn. 408, 415
(1990).

determine the cause of the problem with the subject HVAC unit.  See **Exhibit A**, pp. 66-67; **Exhibit F**, p. 53.  Furthermore, problems with the units had existed during the four years that Swan Associates performed the maintenance work and Swan was likewise unable to correct the problems.  See **Exhibit A**, pp. 17, 22-23, 34.

The plaintiff has not disclosed an expert witness to testify to either the applicable standard of care or McQuay's alleged breach of said standard.  Almost two years have elapsed since the suit was filed, and almost three years have passed since the alleged incident.  The scheduling order deadline for the disclosure of plaintiff's expert witnesses has passed.  Absent expert testimony, the plaintiff's claims against McQuay must fail.

Assuming *arguendo* that any future expert disclosure by the plaintiff would be timely, the plaintiff should be precluded from providing expert testimony due to the removal and disposal of various parts integral to the operation of the unit as of February 22, 2001.  No investigation was conducted on behalf of either SPAFAS or the plaintiff prior to the modification of the subject HVAC unit.  See **Exhibit A**, pp. 66-67; and **Exhibit B**, ¶¶ 10-13.  Hence, there is no expert testimony to proffer.

### 2.    The Plaintiff Has Failed To Provide Any Evidence Of Negligence And/Or Breach Of A Contract

Assuming *arguendo* that expert testimony is not required, the plaintiff's claims must nonetheless fail.  The defendants have deposed all of the witnesses identified as

having knowledge regarding this matter.  None of those individuals can offer testimony regarding the cause of the problem with the HVAC unit on the date in question (see **Exhibit A**, pp. 66-67; **Exhibit D**, p. 68; and **Exhibit F**, pp. 26, 53-54), any alleged breach of contractual obligation by McQuay (see **Exhibit A**, pp. 67-70; **Exhibit D**, pp. 59-60; and **Exhibit F**, pp. 48, 53), or any alleged negligence on the part of McQuay in inspecting, testing, servicing and/or maintaining the HVAC unit (see **Exhibit A**, pp. 68-70; **Exhibit D**, pp. 60-61; and **Exhibit F**, p. 53).  The system was designed by SPAFAS (see **Exhibit A**, pp. 14-16, 92-94) and proved problematic prior to McQuay's involvement in servicing the HVAC unit (see **Exhibit A**, pp. 17, 22-23, 34).  Since the February 22, 2001 incident, SPAFAS has replaced several of the parts of the HVAC unit and discarded the old parts.  See **Exhibit A**, pp. 40-43, 76-77.  No investigation was conducted into the cause of the problem with the HVAC unit prior to the dismantling of the same.  See **Exhibit A**, pp. 66-67.  As such, any opinions regarding the alleged negligence and/or breach of contractual obligations must derive from individuals who were involved with the unit prior to its renovation.  Those individuals have been deposed and do not support the plaintiff's claim.  Accordingly, McQuay is entitled to summary judgment in its favor.

      **B.**    **McQuay Is Not Liable For Any Incidental, Consequential, Indirect Or Special Damages, Loss Of Use, Loss Of Profits Or Loss Of Revenue**

"It axiomatic that a party is entitled to rely upon its written contract as a final integration of its rights and duties." Levine v. Massey, 232 Conn. 272, 279, 654 A.2d 737 (1995), citing, Zullo v. Smith, 179 Conn. 596, 427 A.2d 409 (1980). "[A] contract is to be interpreted according to the intent expressed in its language and not by an intent the court may believe existed in the minds of the parties." Levine, 232 Conn. at 278. A question of the parties' intent is generally an issue of fact; where, however, there is definitive contract language, the determination of the parties' intent becomes a question of law. See id. at 277. "The court will not torture words to impart ambiguity when ordinary meaning leaves no room for ambiguity." Id. at 279, quoting, Downs v. National Casualty Co., 146 Conn. 490, 152 A.2d 316 (1959). Further, "a presumption that the language used is definitive arises when, as in the present case, the contract at issue is between sophisticated parties and is commercial in nature." B&D Associates, Inc. v. Russel, 73 Conn. App. 66, 807 A.2d 1001 (2002), quoting, United Illuminating Co. v. Wisvest-Connecticut, LLC, 259 Conn. 655, 670-71, 791 A.2d 546 (2002).

In B&D Associates, the Connecticut Appellate Court analyzed the enforceability of a release of liability clause set forth in a building lease. The Court noted the following:

> When applied to contracts to which the parties are sophisticated business entities, 'the law, reflecting the economic realities, will recognize an agreement to relieve one party from the consequences of his negligence on the strength of a broadly worded clause framed in less precise

language than would normally be required, though even then it must
evince the unmistakable intent of the parties…'

Id. at 73.  The lease provision at issue provided that:

Risk of Loss.  It is expressly understood and agreed between the parties
hereto that all goods, wares, merchandise, equipment, furnishings, tools,
machinery and every other property of any other nature whatsoever,
stored, used, maintained or kept on the herein leased premises, will be
stored, used, maintained and kept on the herein leased premises by said
TENANT, … solely at the risk of TENANT…; and there shall be no liability
on the part of the LANDLORD to said TENANT and/or to any of said
persons or classes of persons, or to anyone else for any damage or loss
to any of the foregoing from any cause or for any reason whatsoever.

Id. at 69.  The Court held that said language was clear and unambiguous and

released the defendant from liability for losses of any property stored, used,

maintained or kept on the premises.  Id. at 73-74.

In this case, the language set forth in both the Assured Maintenance Agreement

entered into between SPAFAS and McQuay, and the limitation of liability provision

included in every one of McQuay's service orders are enforceable.  First, there is

definitive, unambiguous contract language.  The Agreement provides that:

McQuayService shall not in any event be liable to the customer or third
parties for any incidental, consequential, indirect or special damages,
including but not limited to, loss of production, loss of use or loss of profits
or revenue arising from any cause whatsoever including, but not limited to
any delay, act, error or omission on McQuay's service.

See Exhibit C, ¶16.

16

The Agreement specifically states that McQuay will not be liable for certain damages "arising from *any cause whatsoever* including, but not limited to *any delay, act, error or omission of McQuayService.*"  See **Exhibit C**, ¶16.  The language was readily obvious and distinguishable as it was the only paragraph set forth in all capital letters.

Similarly, the limitation of liability clause set forth in the service orders leaves no room for ambiguity.  Said limitation of liability provision states that:

> McQuay, its contractors and suppliers of any tier shall not be liable in contract, in tort (including negligence) or otherwise for damage or loss of property or equipment, loss of profits or revenue, loss of use of equipment or power system, cost of capital, cost of purchased or replacement power or temporary equipment (including additional expense incurred in using existing facilities), claims of customers of the purchaser, or for any special, indirect, incidental or consequential damages, whatsoever.

The clause specifically states that McQuay "shall not be liable in contract, in tort (*including negligence*) or otherwise" for certain damages.  The language was readily identified as a "Limitation of Liability."

Second, the clauses are enforceable because there was no inequity of bargaining power between SPAFAS and McQuay, both sophisticated business entities.  Charles River Labs is a worldwide corporation whose stock is traded on the New York Stock Exchange.  See **Exhibit D**, pp. 5, 7.  SPAFAS was in a better position than McQuay to assess any possible damages and did insure for the same.  Robert Sirpenski, controller, signed the Agreement on behalf of SPAFAS.  Mr. Sirpenski is

well educated with an MBA and an MS in management.  <u>See</u> **Exhibit D**, pp. 4, 7.

Mr. Sirpenski read the Agreement before he signed it and is presumed to have

understood its terms.  <u>See</u> **Exhibit D**, pp. 48-49.

Sophisticated business entities are entitled to rely on unambiguous contract

language even where the language provides for the release of liability by one party to

the other.  <u>See</u> <u>B&D Associates</u>, <u>supra</u>.  The language set forth in these documents is

clear and unambiguous, and is therefore enforceable.  As such, the plaintiff is

precluded from recovering any damages for incidental, consequential, indirect or

special damages, loss of use, loss of profits or loss of revenue.

### C.    The Plaintiff's Damages, If Any, Are Limited To The Payment Received By McQuayService For The Work Performed

Assuming *arguendo* that McQuay is found liable for negligence or breach of

contract, any damages awarded must be limited to either the amount McQuay

received under the Agreement or the amount received for service work performed on

an as needed basis.

In <u>Leon's Bakery, Inc. v. Grinnell Corp.</u>, 990 F.2d 44 (2nd Cir. 1993), the Second

Circuit Court of Appeals considered the validity under Connecticut law of a limitation of

liability clause in the context of a fire detection and sprinkler system.  The court noted

that the supplier of either a burglar alarm or a fire alarm system paid for its equipment

and services – not to insure property.  <u>See</u> <u>id</u>.  The court further noted that "[t]he owner

or custodian of the property is in a far better position than the alarm system seller to know the property's value and to bargain with an insurance company for appropriate coverage and an appropriate premium, " and that limitations on liability help to keep alarm services affordable.  Id.  The court found that the plaintiff "was a commercial entity presumably aware of the risks involved in relying on such a system," and that the plaintiff "presented no evidence from which it can be inferred either that the price it paid for the system included an insurance premium to [the defendant] or that the limitation clause and warranty were not elements of the contract that [the defendant] bargained for and thus factored into its quoted price."  Id.  Accordingly, the court upheld the district court's judgment of dismissal on the basis that the limited liability clause was enforceable.  Id.

Connecticut courts consider the following three factors in determining the validity of a liquidated damages clause: (1) whether the damage which was to be expected as a result of a breach of contract was uncertain in amount or difficult to prove; (2) the intent on the part of the parties to liquidate damages in advance; and (3) whether the amount stipulated was reasonable.  See Berger v. Shanahan, 142 Conn. 726, 732, 118 A.2d 311 (1955); see e.g., Forster v. Advances Electronic, 2002 Ct. Sup. 12980 (Oct. 9, 2002) (Aurigemma, J.); Hartford Ins. Co. v. A.D.T. Sec. Sys., 1999 Ct. Sup. 5285, *5287 (Apr. 22, 1999) (Nadeau, J.); U.S. Fidelity & Guaranty, supra; Hunter's Consignments v. Sonitrol of W. Conn., 1994 Ct. Sup. 11221-C (Nov. 16,

1994) (Mihalakos, J.); <u>Convenient Petroleum Corp. v. Sonitrol Communications Corp.</u>,

1992 Ct. Sup. 5857 (June 12, 1992) (Wagner, J.); <u>Hanover Ins. Co. v. American</u>

<u>District Telegraph Co.</u>, 1991 Ct. Sup. 10650 (Dec. 4, 1991) (Stengel, J.) (cases

attached as **Exhibit J**).

 In <u>Forster</u>, the court granted summary judgment in favor of the defendant based

on a liquidated damages provision set forth in an alarm system agreement.  First, the

court found that the potential damages were uncertain and difficult to determine,

noting that the defendant was not a property insurer and could not be expected to

know the value of a customer's home and belongings.  <u>Id</u>. at *12985.  Second, the

court found that the contract language evidenced the intent of the parties.  <u>Id</u>.  As to

the third factor, the court applied the following reasoning from <u>Lyon's Bakery</u>:

> [T]he supplier … is paid for its equipment and services, and the price does
> not generally include a sum designed to anticipate the possible need to
> pay the purchaser the value of the property that the system is to protect.
> The owner or the custodian of the property is in a far better position than
> the alarm system seller to know the property's value and bargain with an
> insurance company for appropriate coverage and an appropriate premium.

<u>Id</u>. at 12986.  The court held that the defendant cannot be expected to cover such

losses.  <u>Id</u>.

 As in <u>Forster</u>, each of these factors weigh in support of the enforceability of the

subject liquidated damages provisions as well.  First, the damages were uncertain and

not foreseeable.  The value of the chickens depended on the age of the chickens, and

the quality and quantity of their eggs.  These characteristics varied.  <u>See</u> **Exhibit D**, pp. 36-41.  McQuay is not an authority in poultry production and could not be expected to know the value of chickens and eggs, used not for ordinary consumption, but for vaccines and research purposes.  <u>See</u> **Exhibit D**, pp. 36-38.

Second, the parties expressed their intent to liquidate damages in advance. The Agreement provides that:

> In no event will McQuayService's liability for direct or compensatory damages exceed the payment received by McQuayService from customer under the instant agreement.

<u>See</u> **Exhibit C**, ¶16.  Similarly, the limitation of liability clause set forth in the service orders states that:

> The remedies of the purchaser set forth herein are exclusive and the liability of McQuay with respect to any contract, or anything done in connection herewith such as the performance or breach thereof, of from the manufacture, sale, delivery, resale, installation or technical direction of installation, maintenance or technical direction of maintenance, repair or use of any equipment covered by or furnished under the contract, whether in contract, tort (including negligence) or otherwise, shall not exceed the price set forth herein for the work.

<u>See</u> **Exhibit E**.  The language is unambiguous.  Damages shall not exceed the payment received by McQuay for services performed.

Third, the defendant cannot be expected to cover the losses incurred.  SPAFAS was insured and was paid over $125,000.  <u>See</u> Plaintiff's Complaint, ¶ 18.  The plaintiff in this case was the insurer, not the defendant.  As such, the plaintiff's

damages, if any, for breach of contract or negligent inspection are limited to the payment received under the Agreement, which is $4,133.00.  <u>See</u> **Exhibit C**, p.4. Likewise, the plaintiff's damages, if any, for negligent repair and/or service are limited to the price set forth as payment for the work performed.

**V.      CONCLUSION**

For the foregoing reasons, the Court should enter summary judgment in favor of the defendant, McQuay International d/b/a McQuay Service Air Conditioning, as to the plaintiff's complaint in its entirety.

DEFENDANT,
MCQUAY INTERNATIONAL D/B/A
MCQUAY SERVICE AIR CONDITIONING


By <u>/s/ Alexandria L. Voccio</u>
  Alexandria L. Voccio
  ct21792
  Howd & Ludorf
  65 Wethersfield Avenue
  Hartford, CT  06114
  (860) 249-1361
  (860) 249-7665 (Fax)
  E-mail:  avoccio@hl-law.com

## <u>CERTIFICATION</u>

This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail to the following counsel of record this 1st day of December, 2003.

David Rubin, Esquire
750 Summer Street
Stamford, CT  06901

William N. Clark, Jr., Esquire
Cozen & O'Connor
1900 Market Street
Philadelphia, PA  19103

Ronald D. Williams, Jr.
Williams, Cooney & Sheehy
799 Silver Lane
Trumbull, CT  06611-0753


                    By /s/ Alexandria L. Voccio
                       Alexandria L. Voccio